ATTORNEY GENERAL v BLUE CROSS BLUE SHIELD
OF MICHIGAN

Docket Nos. 290167 and 295750. Submitted October 5, 2010, at Lansing. Decided December 7, 2010, at 9:05 a.m.

The Attorney General brought an action in the Ingham Circuit Court against Blue Cross Blue Shield of Michigan (BCBSM), challenging the legality of certain financial conduct by BCBSM under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq.* The challenges concerned a series of financial transactions undertaken by the Accident Fund Insurance Company of America, a wholly owned, for-profit Michigan stock insurance subsidiary of BCBSM, in acquiring three for-profit foreign insurance companies, and the transfer by BCBSM to the Accident Fund of $125 million, as a capital contribution with no repayment obligation. BCBSM moved for summary disposition, arguing that the provisions of MCL 550.1207(1)(o) regarding the acquisition of certain types of foreign insurers by a health-care corporation applied only to BCBSM, a health-care corporation under the act, but not to the Accident Fund, which is not a health-care corporation under the act. BCBSM also argued that it did not violate the act by making the capital contribution to the Accident Fund. Alternatively, BCBSM moved to refer the question of the legality of the capital contribution to the Commissioner of the Office of Financial and Insurance Regulation (OFIR) for resolution pursuant to the doctrine of primary jurisdiction. The court, Paula J. M. Manderfield, J., granted summary disposition in favor of BCBSM with regard to the count alleging that the Accident Fund's acquisition of the foreign insurers violated MCL 550.1207(1)(o), concluding that the restrictions set forth in the statute did not directly apply to transactions undertaken by the Accident Fund, nor did they apply to actions taken by BCBSM indirectly by and through the Accident Fund, its subsidiary. The court also dismissed without prejudice the count concerning the $125 million capital contribution and referred that matter to the OFIR Commissioner under the doctrine of primary jurisdiction. Plaintiff appealed (Docket No. 290167). The OFIR Commissioner then held that the capital contribution by BCBSM to the Accident Fund did not violate the

act. The Attorney General filed a second complaint in the circuit court against BCBSM and a petition to review the OFIR Commissioner's order, naming the OFIR and the OFIR Commissioner as respondents. The court, Paula J. M. Manderfield, J., granted summary disposition in favor of BCBSM and the respondents' motion to dismiss, concluding that it lacked jurisdiction to hear the case as an original action and that the petition for review had not been timely filed. Plaintiff appealed (Docket No. 295750). The appeals were consolidated.

The Court of Appeals *held*:

The trial court correctly determined that MCL 550.1207 did not preclude the Accident Fund from acquiring the foreign insurance companies. The trial court's grant of summary disposition with regard to that issue must be affirmed. The trial court erred by deferring to the OFIR Commissioner's interpretation of the act with regard to the legality of the capital contribution. Therefore, the dismissal of the count concerning that issue must be reversed, and the matter must be remanded to the trial court for a hearing de novo to determine whether the capital contribution violated the act. The appeal in Docket No. 295750 must be dismissed as moot.

1. The trial court's dismissal of the count of the original complaint regarding the capital contribution in the manner and under the circumstances presented in this matter constituted a final "disposition" of that claim for purposes of MCR 7.202(6)(a)(i).

2. The trial court correctly concluded that MCL 550.1207(1)(o) did not apply to the acquisition of the foreign insurers by the Accident Fund, BCBSM's wholly owned subsidiary. Nothing in the statute expressly prohibits any particular activity undertaken by a health-care corporation's subsidiary. The transactions about which plaintiff complains were not undertaken by BCBSM, they were undertaken by the Accident Fund, to which the restrictions of the statute are inapplicable. BCBSM did not itself invest in, purchase, take, receive, subscribe for, acquire, own, hold, vote, or employ any interest in the foreign insurance companies purchased by the Accident Fund. Thus, BCBSM did not "otherwise" engage in any such activity in violation of the statute.

3. The trial court correctly reasoned that reading MCL 550.1207(1)(o) as implicitly preventing the acquisition of workers' compensation insurers by the Accident Fund would be contrary to the language of MCL 550.1207(1)(x)(*i*), which explicitly permits such acquisitions.

4. The doctrine of primary jurisdiction permitted the trial court to refer the capital contribution issue to the OFIR Commis-

sioner for an advisory opinion, but the trial court erred by failing to retain jurisdiction regarding the issue and by failing to make a determination de novo with regard to the statutory-interpretation issue.

5. An agency's interpretation of a statute is not binding on the courts, and cannot be used to overcome the plain meaning of the statute. It is the courts, not the OFIR, that have the ultimate authority over the interpretation of the act, therefore, any statutory interpretation rendered by the OFIR Commissioner in this case was not binding on the trial court. The trial court erred when it failed to make an independent interpretation of the statute at issue with regard to the capital contribution issue.

Affirmed in part, reversed in part, and remanded.

BANDSTRA, J., concurring in part and dissenting in part, disagreed with the decision to remand to the trial court the issue regarding the capital contribution to allow the parties an opportunity to present evidence and fully brief the issue. The issue has been fully briefed, and no set of facts would justify the contribution under the clear language of MCL 550.1207(1)(x). By its plain language, MCL 550.1207(1)(x)(*vi*) prohibits BCBSM funds from being used to operate or subsidize in any way the Accident Fund. BCBSM is prohibited from using its funds to aid the Accident Fund with a grant or contribution of money, in any manner or fashion. The $125 million nonrepayable contribution of BCBSM funds to the Accident Fund meets this definition. The statute prohibits BCBSM from contributing its funds to the Accident Fund for any purpose, not merely for the purpose of subsidizing the Accident Fund's insurance rates. The "other financial transactions" permitted by the statute are of the type that have direct, immediate, and concrete mutual economic/financial benefit. A transfer of $125 million from BCBSM to the Accident Fund, without any repayment obligation or direct benefit to BCBSM, regardless of the purpose, does not meet this criteria. Judge BANDSTRA would conclude, without remanding the matter, that the $125 million contribution was impermissible under MCL 550.1207(1)(x).

1. CORPORATIONS — HEALTH-CARE CORPORATIONS — NONPROFIT HEALTH CARE CORPORATION REFORM ACT — SUBSIDIARIES OF HEALTH-CARE CORPORATIONS.

The restrictions on permissible activities by a health-care corporation in MCL 550.1207(1)(o) do not expressly prohibit any particular activity undertaken by a health-care corporation's subsidiary that is not a health-care corporation.

2. COURTS — ADMINISTRATIVE LAW — DOCTRINE OF PRIMARY JURISDICTION.

The doctrine of primary jurisdiction is applicable where the issues presented are of a type that an administrative agency possesses superior knowledge and expertise over the courts and that involve a regulatory area unfamiliar to the courts; referral to an agency is appropriate for preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to thereafter be decided by the courts; it is the courts, not administrative agencies, that have ultimate authority over statutory interpretation and any statutory interpretation rendered by an administrative agency is not binding on the courts.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Robert Ianni* and *Michael E. Moody*, Assistant Attorneys General, for the Attorney General in Docket No. 290167.

*Michael A. Cox*, Attorney General, and *Robert Ianni* and *Michael E. Moody*, Assistant Attorneys General, for the Attorney General in Docket No. 295750.

*B. Eric Restuccia*, Solicitor General, and *Michael P. Farrell*, Assistant Attorney General, for the Office of Financial and Insurance Regulation and the Commissioner of the Office of Financial and Insurance Regulation in Docket No. 295750.

*Dickinson Wright PLLC* (by *Joseph A. Fink, Jeffery V. Stuckey*, and *Scott R. Knapp*), for Blue Cross Blue Shield of Michigan.

Amicus Curiae:

*Dykema Gossett PLLC* (by *Lori McAllister, Sandra M. Cotter*, and *Shaun M. Johnson*) for the Coalition for a Fair & Competitive Insurance Market.

Before: O'CONNELL, P.J., and BANDSTRA and MARKEY, JJ.

O'CONNELL, P.J. In these consolidated appeals, plaintiff/petitioner (hereafter plaintiff) appeals as of right the trial court's orders granting motions for summary disposition filed by defendant Blue Cross Blue Shield of Michigan (BCBSM) in actions in which plaintiff challenged the legality of certain financial conduct by BCBSM under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq.* (the Act). The appeals present two significant issues: (1) whether BCBSM violated § 207 of the Act, MCL 550.1207, when its subsidiary, the Accident Fund Insurance Company of America (the Accident Fund), purchased three for-profit insurance companies; and (2) whether Michigan's courts defer to the decisions of Michigan's administrative agencies concerning the interpretation of Michigan statutes.

Regarding the first issue, the trial court correctly determined that § 207 of the Act did not preclude the Accident Fund from acquiring the three insurance companies. Accordingly, in Docket No. 290167, we affirm the trial court's grant of summary disposition on count I. Regarding the second issue, the trial court erred by deferring to an administrative agency's interpretation of the Act. Accordingly, we reverse the trial court's dismissal of count II in Docket No. 290167, and remand to the trial court for a hearing de novo to determine whether BCBSM's $125 million contribution to the Accident Fund violated the Act. In addition, we dismiss the appeal in Docket No. 295750 as moot.

BACKGROUND FACTS

As our Supreme Court has explained:

> BCBSM is a unique creation. It is a non-profit, tax-exempt "charitable and benevolent institution", incorporated pursuant to special enabling legislation enacted by

the Michigan Legislature in 1939, for the purpose of providing a mechanism for broad health care protection to the people of the State of Michigan.

*  *  *

BCBSM is not an insurance company in the usual sense of the term. It is a statutory, non-profit corporation which is regulated within the limits of special enabling legislation by the Commissioner [of the Office of Financial and Insurance Regulation (OFIR)] "in order to protect the interests of subscribers". Although it does operate according to principles similar to those of insurance companies, "it is not carried on as an insurance business for profit * * *, but rather it provides a method for promoting the public health and welfare in assisting * * * persons to budget" health care costs.

Although BCBSM is regulated by the [OFIR] Commissioner, it is not managed by the Commissioner. It has its own officers and a board of directors to which management of the corporation is statutorily entrusted. [*Blue Cross & Blue Shield of Mich v Ins Comm'r*, 403 Mich 399, 415-418; 270 NW2d 845 (1978) (citations omitted).]

As a statutorily created entity, both the extent of the power of the commissioner of the OFIR (the OFIR Commissioner) to regulate BCBSM and the extent of BCBSM's permissible activities are governed by statute, and specifically, by the Act. *Id.* at 424; MCL 550.1101 *et seq.*

In 1993, the Legislature amended the Act to permit BCBSM to purchase the state accident fund, a for-profit workers' compensation insurer. MCL 550.1207(1)(x). Thereafter, BCBSM formed the Accident Fund as a wholly owned, for-profit Michigan stock insurance subsidiary, and, in December 1994, the Accident Fund purchased the assets and acquired the liabilities of the state accident fund.

At issue here are a series of financial transactions undertaken by the Accident Fund to acquire three

foreign insurance companies, as well as a $125 million contribution to the Accident Fund by BCBSM. In December 2005, the Accident Fund acquired 100 percent of the outstanding common shares of workers' compensation insurer United Wisconsin Insurance Company (UWI). On August 4, 2007, BCBSM's board of directors approved the Accident Fund's forthcoming acquisition of CWI Holdings, Inc. (CWI), a Delaware insurance holding company that itself owns 100 percent of the shares of CompWest Insurance Company, a California property and casualty insurance company that provides workers' compensation insurance primarily in California, and it also approved a capital contribution from BCBSM to the Accident Fund "in an amount sufficient to insure [sic] the collective workers' compensation companies are able to maintain an 'A' insurance rating." Then, on August 31, 2007, the Accident Fund acquired 100 percent of the outstanding common shares of Third Coast Insurance Company (Third Coast), an inactive property and casualty insurance company located in Illinois. Finally, in November 2007, BCBSM transferred $125 million to the Accident Fund, as a capital contribution with no repayment obligation pursuant to the August 4, 2007, authorization of its board of directors, and the Accident Fund acquired 100 percent of the outstanding shares of CWI.

On July 2, 2008, plaintiff filed a three-count complaint against BCBSM, challenging the permissibility of the Accident Fund's acquisition of UWI, CWI, and Third Coast, as well as of BCBSM's November 2007 $125 million contribution to the Accident Fund. Only counts I and II are at issue before this Court.[1] In count I, plaintiff alleged that the Accident Fund's acquisition

---

[1] Count III, which alleged that BCBSM's $125 million contribution to the Accident Fund constituted a breach of the asset purchase agreement

of the three foreign insurers violated MCL 550.1207(1)(o), which provides, as follows:

> A *health care corporation*, subject to any limitation provided in this act, in any other statute of this state, or in its articles of incorporation, *may do any or all of the following*:
>
> &ast; &ast; &ast;
>
> (o) Subject to chapter 9 of the insurance code of 1956, 1956 PA 218, MCL 500.901 to 500.947, *invest and reinvest its funds* and, for investment purposes only, *purchase, take, receive, subscribe for, or otherwise acquire*, own, hold, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of, mortgage, pledge, use, and otherwise deal in and with, bonds and other obligations, shares, or other *securities or interests issued by entities other than domestic, foreign, or alien insurers*, as defined in sections 106 and 110 of the insurance code of 1956, 1956 PA 218, MCL 500.106 and 500.110, whether engaged in a similar or different business, or governmental or other activity, including banking corporations or trust companies. However, *a health care corporation may purchase, take, receive, subscribe for, or otherwise acquire*, own, hold, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of bonds or other obligations, shares, or other *securities or interests issued by a domestic, foreign, or alien insurer, so long as the activity meets all of the following*:
>
> (*i*) Is determined by the attorney general to be lawful under section 202 [MCL 550.1202].
>
> (*ii*) Is approved in writing by the commissioner as being in the best interests of the health care corporation and its subscribers.
>
> (*iii*) For an activity that occurred before the effective date of the amendatory act that added subparagraph (*iv*), will not result in the health care corporation owning or

---

between BCBSM and the state, was dismissed by the trial court, and plaintiff has not appealed that decision.

controlling 10% or more of the voting securities of the insurer or will not otherwise result in the health care corporation having control of the insurer, either before or after the effective date of the amendatory act that added subparagraph (iv). As used in this subparagraph and subparagraph (iv), "control" means that term as defined in section 115 of the insurance code of 1956, 1956 PA 218, MCL 500.115.

(iv) Subject to section 218 [MCL 550.1218] and beginning on the effective date of the amendatory act that added this subparagraph, will not result in the health care corporation owning or controlling part or all of the insurer unless the transaction satisfies chapter 13 of the insurance code of 1956, 1956 PA 218, MCL 500.1301 to 500.1379, and the insurer being acquired is only authorized to sell disability insurance as defined under section 606 of the insurance code of 1956, 1956 PA 218, MCL 500.606, or under a statute or regulation in the insurer's domiciliary jurisdiction that is substantially similar to section 606 of the insurance code of 1956, 1956 PA 218, MCL 500.606. [Emphasis added.]

Plaintiff alleged that the Accident Fund's acquisition of UWI, CWI, and Third Coast violated the general prohibition, in the first sentence of subdivision (o) of § 207(1), against the acquisition of any "domestic, foreign, or alien insurers . . . ." While the second sentence of subdivision (o) provides an exception to that prohibition in certain situations, plaintiff further argued that the Accident Fund's acquisitions at issue here did not fall within the exception language.[2] Plaintiff further alleged, in count II of plaintiff's initial complaint, that

---

[2] While contending that subdivision (o) in its entirety is inapplicable to the Accident Fund, BCBSM has not disputed plaintiff's assertion that the Accident Fund's purchase of UWI, CWI, and Third Coast would not fall within the exception language if the subdivision applied. Further, we note that BCBSM's purchase of the Accident Fund was specifically allowed by a statute that excepted that particular acquisition from the prohibition of MCL 550.1207(1)(o). MCL 550.1207(1)(x).

BCBSM's November 2007 contribution of $125 million to the Accident Fund violated the restriction set forth in MCL 550.1207(1)(x)(*vi*), which prevents BCBSM from using its funds to "operate or subsidize in any way" the Accident Fund.[3]

BCBSM moved in the trial court for summary disposition of the complaint pursuant to MCR 2.116(C)(8), asserting that MCL 550.1207(1)(o) applies only to BCBSM, because it is "a health care corporation" under the Act, and that the statute does not apply to the Accident Fund, because it is not such a health-care corporation.[4] Further, BCBSM argued that it did not violate the Act by virtue of its capital contribution to the Accident Fund. Alternatively, BCBSM moved in the trial court to dismiss count II and refer it to the OFIR Commissioner for resolution pursuant to the doctrine of primary jurisdiction.

The trial court initially denied BCBSM's motion regarding count I. On count II, the trial court concluded that plaintiff had alleged sufficient facts to state a claim that BCBSM violated the statute by making the $125

---

[3] The statute provides that a health-care corporation, notwithstanding the provisions of subdivision (o), may establish, own, and operate a domestic stock insurance company only for the purpose of acquiring, owning, and operating the state accident fund, as long as

> [h]ealth care corporation and subscriber funds are not used to operate or subsidize in any way the insurer including the use of such funds to subsidize contracts for goods and services. This subparagraph does not prohibit joint undertakings between the health care corporation and the insurer to take advantage of economies of scale or arm's-length loans or other financial transactions between the health care corporation and the insurer. [MCL 550.1207(1)(x)(*vi*).]

[4] The parties do not contest the fact that BCBSM is a health-care corporation under the Act and that the Accident Fund is not itself a health-care corporation under the Act. As discussed below, however, they are at odds about the legal implications of these facts.

million contribution to the Accident Fund at the time and in the manner that it did so, but the trial court dismissed that count without prejudice and referred it to the OFIR Commissioner under the doctrine of primary jurisdiction. BCBSM moved for reconsideration of the trial court's denial of its motion for summary disposition of count I of the complaint, and the trial court granted that motion and, on reconsideration, dismissed count I of plaintiff's complaint. On January 13, 2009, the trial court entered an order concluding that the restrictions set forth in MCL 550.1207(1)(o) do not directly apply to transactions undertaken by the Accident Fund, nor do they apply to actions taken by BCBSM indirectly by and through the Accident Fund, its subsidiary.

After plaintiff's appeal of the trial court's January 13, 2009, order was filed in this Court, the OFIR Commissioner considered the issues raised by count II of the complaint and entered his order, concluding that "BCBSM did not violate Section 207(1)(x)(*vi*) in its November 2007 capital contribution to the Accident Fund." Plaintiff then filed a second complaint in the circuit court against BCBSM and a petition to review the OFIR Commissioner's order, naming the OFIR and the OFIR Commissioner as respondents, asking the court to declare that the OFIR Commissioner's resolution of the challenge to BCBSM's capital contribution was contrary to the court's prior interpretation of the statute, that it was "contrary to [the scope of the trial court's] referral [to the OFIR Commissioner] for factual determinations," that it was not authorized by law and was contrary to the plain language of MCL 550.1207(1)(x)(*vi*), and that it was not supported by any record or competent evidence. Respondents moved for summary disposition, asserting that the claim that BCBSM's capital contribution violated MCL

550.1207(1)(x)(*vi*) was within the primary jurisdiction of the OFIR, that the OFIR Commissioner had adjudicated that claim in BCBSM's favor, and that plaintiff's petition that the trial court review the OFIR Commissioner's decision was untimely. BCBSM also moved for dismissal pursuant to MCR 2.116(C)(4), asserting that the trial court lacked subject-matter jurisdiction because plaintiff failed to seek judicial review of the OFIR Commissioner's decision within 21 days of the entering of that order. The trial court granted both BCBSM's motion for summary disposition and respondents' motion to dismiss, concluding that it lacked jurisdiction to hear the case as an original action and that the petition for review of the OFIR Commissioner's decision was not timely filed.

### THE ACCIDENT FUND'S ACQUISITION OF THE INSURERS

Plaintiff first argues, in Docket No. 290167, that the trial court erred by granting summary disposition of count I of plaintiff's initial complaint because, contrary to the trial court's conclusion, MCL 550.1207(1)(o) prohibited the Accident Fund's acquisition of UWI, CWI, and Third Coast. We disagree.

As a preliminary matter, BCBSM asserts that this Court lacks jurisdiction to hear plaintiff's appeal as of right in Docket No. 290167 of the trial court's January 13, 2009, order, because the trial court's October 6, 2008, order granting in part and denying in part BCBSM's motion for summary disposition dismissed count II of plaintiff's complaint *without prejudice* and referred that count to the OFIR Commissioner. BCBSM argues that a dismissal without prejudice is not a final order under MCR 7.203(A), and therefore, that the trial court's disposition of count II in that manner "renders the collective orders from which this appeal is taken

non-final, and deprives this Court of jurisdiction to entertain the appeal of right." We disagree.

The trial court's dismissal of count II of the complaint in the manner and under the circumstances present here, constituted a final "disposition" of that claim for purposes of MCR 7.202(6)(a)(i). *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146; 742 NW2d 409 (2007). In *Rooyakker*, this Court rejected the argument that an order of summary disposition that referred certain claims to arbitration did not constitute a final order, concluding that the order of summary disposition in that case was a final order "because there was nothing left for the trial court to decide and it did not state that it was retaining jurisdiction . . . ." *Id*. at 148 n 1. Likewise, in the present case, there was nothing left for the trial court to decide regarding count II after its decision to refer the claim to the OFIR Commissioner, and the trial court did not state in the October 6, 2008, order dismissing that count without prejudice that it was retaining jurisdiction of that count. Instead, the trial court specifically indicated in its January 13, 2009, order granting summary disposition with regard to count I upon reconsideration that "[t]his decision resolved the last pending claim and closes this case." Thus, plainly, the trial court believed that there was nothing left for it to resolve and that it had "disposed" of all plaintiff's claims by its summary disposition of count I. Therefore, here as in *Rooyakker*, there was nothing left for the trial court to decide, and all claims were finally "disposed" of within the meaning of MCR 7.202(6)(a)(i).

Turning to the substantive issue presented, we first observe that this Court reviews de novo both a trial court's decision on a motion for summary disposition and questions of statutory interpretation. *City of Taylor*

*v Detroit Edison Co*, 475 Mich 109, 115; 715 NW2d 28 (2006); *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). As this Court explained in *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998):

> A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. This Court reviews de novo a trial court's decision regarding a motion for summary disposition under MCR 2.116(C)(8) to determine whether the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery. All factual allegations supporting the claim, and any reasonable inference or conclusions that can be drawn from the facts, are accepted as true. [Citations omitted.]

The trial court determined that plaintiff failed to state a claim on which relief could be granted pursuant to MCL 550.1207(1)(o), because that section is inapplicable to the Accident Fund's acquisition, ownership, and operation of UWI, CWI, and Third Coast. As previously noted, MCL 550.1207(1)(o) provides, in pertinent part:

> A health care corporation, subject to any limitation provided in this act, in any other statute of this state, or in its articles of incorporation, may do any or all of the following:
>
> *     *     *
>
> (o) Subject to chapter 9 of the insurance code of 1956 . . . invest and reinvest its funds and, for investment purposes only, purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of, mortgage, pledge, use, and otherwise deal in and with, bonds and other obligations, shares, or other securities or interests issued by entities other than domestic, foreign, or alien insurers, as defined in sections 106 and 110 of the insurance code of 1956 . . .

whether engaged in a similar or different business, or governmental or other activity, including banking corporations or trust companies.

This Court's goal when interpreting a statute is to discern and give effect to the Legislature's intent. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). The intent of the Legislature is most reliably shown through the words used in the statute. *Id.* If the language in the statute is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and the statute must be enforced as written. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995). In such cases, judicial construction is neither required nor permitted. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005), citing *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). Effect should be given to every phrase, clause, and word in the statute, and this Court will avoid a construction that would render any part of a statute surplusage or nugatory. *Herman v Berrien Co*, 481 Mich 352, 366; 750 NW2d 570 (2008). "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999). And, this Court "must consider both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme." *People v Williams*, 268 Mich App 416, 425; 707 NW2d 624 (2005). This Court may " 'consult dictionary definitions of terms that are not defined in a statute.' " *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006), quoting *People v Perkins*, 473 Mich 626, 639; 703 NW2d 448 (2005). However, "technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood

according to such peculiar and appropriate meaning."
MCL 8.3a; *Woodard*, 476 Mich at 561.

There is no dispute that BCBSM, as a "health care
corporation," was plainly prohibited by MCL
550.1207(1)(o) from directly acquiring UWI, CWI, and
Third Coast. And, there is no allegation that it did so.
The question presented is whether MCL 550.1207(1)(o)
has any application to the acquisition of these insurers
by BCBSM's wholly owned subsidiary, the Accident
Fund. We agree with the trial court's conclusion that it
does not.

By its plain language, MCL 550.1207(1) sets forth
permissible activities by a "health care corporation,"
that is, a "nonprofit hospital service corporation, medi-
cal care corporation, or a consolidated hospital service
and medical care corporation incorporated or reincor-
porated under" the Act. MCL 550.1105(2); MCL
550.1207(1). This includes BCBSM; it does not include
the Accident Fund. Therefore, MCL 550.1207(1)(o) has
no direct application to the Accident Fund's business
activities. It applies here, then, only if it prevents
BCBSM from activity undertaken by its wholly owned
subsidiary. However, nothing in MCL 550.1207(1)(o)
expressly prohibits any particular activity undertaken
by a health-care corporation's subsidiary. The restric-
tions set forth in MCL 550.1207(1)(o) plainly apply only
to a "health care corporation"; they do not mention or
refer to such a corporation's affiliates or subsidiaries.

Plaintiff argues that the prohibition against the
Accident Fund's acquisition of UWI, CWI, and Third
Coast arises from the statute's prohibition against
BCBSM "otherwise" acquiring, owning, or holding vot-
ing shares or voting securities or interests issued by a
domestic, foreign, or alien insurer. That is, plaintiff
argues that the acquisition of UWI, CWI, and Third

Coast by the Accident Fund constituted BCBSM "otherwise" acquiring those insurers within the meaning of MCL 550.1207(1)(o). Plaintiff points to language in MCL 550.1207(1)(o)(*iii*) and (iv), prohibiting a health-care corporation from direct or indirect control of certain types of insurers, as supporting plaintiff's assertion. Again, however, we find dispositive the fact that there is simply nothing in the plain language of the statute to support a conclusion that MCL 550.1207(1)(o) prohibits activities undertaken by the Accident Fund. The entirety of MCL 550.1207(1)(o) applies only to "health care corporations," and it permits BCBSM to acquire certain types of foreign insurers under certain circumstances. Thus, MCL 550.1207(1)(o) only applies when BCBSM undertakes a financial transaction meeting certain criteria. However, the transactions about which plaintiff complains were not undertaken by BCBSM; they were undertaken by the Accident Fund, to which the restrictions of MCL 550.1207(1)(o) are inapplicable. With respect to plaintiff's reliance on the "otherwise" language of the statute, BCBSM did not itself "invest [in] . . . purchase, take, receive, subscribe for, . . . acquire, own, hold, vote, [or] employ" any interest whatsoever in the three insurance companies purchased by the Accident Fund in any manner whatsoever. Thus, it did not itself "otherwise" engage in any such activity in violation of the statute.

Of further note in analyzing plaintiff's argument that MCL 550.1207(1)(o)(*iii*) and (*iv*) prohibit BCBSM from indirectly controlling UWI, CWI, and Third Coast by virtue of the acquisition of those companies by the Accident Fund, is the 2003 amendment of this section. Before that amendment, MCL 550.1207(1)(o) read as follows:

A health care corporation, subject to any limitation provided in this act, in any other statute of this state, or in its articles of incorporation, may do any or all of the following:

*   *   *

(o) Invest and reinvest its funds and, for investment purposes only, purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of, mortgage, pledge, use, and otherwise deal in and with, bonds and other obligations, shares, or other securities or interests issued by entities other than domestic, foreign, or alien insurers, as defined in sections 106 and 110 of the insurance code of 1956 . . . whether engaged in a similar or different business, or governmental or other activity, including banking corporations or trust companies. However, a health care corporation may purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of bonds or other obligations, shares, or other securities or interests issued by a domestic, foreign, or alien insurer, so long as the activity meets all of the following:

(*i*) Is determined by the attorney general to be lawful under section 202.

(*ii*) Is approved in writing by the commissioner as being in the best interests of the health care corporation and its subscribers.

(*iii*) Will not result in the health care corporation owning or controlling 10% or more of the voting securities of the insurer. *Nothing in this subdivision shall be interpreted as expanding the lawful purposes of a health care corporation under this act. Except where expressly authorized by statute, a health care corporation shall not indirectly engage in any investment activity that it may not engage in directly.* A health care corporation shall not guarantee or become surety upon a bond or other undertaking securing the deposit of public money. [Emphasis added.]

Effective July 23, 2003, however, subparagraph (*iii*) was rewritten, and a new subparagraph (*iv*) was added. As quoted earlier in this opinion, the amended subparagraph (*iii*) and the new subparagraph (*iv*) read as follows:

> (*iii*) For an activity that occurred before the effective date of the amendatory act that added subparagraph (*iv*), will not result in the health care corporation owning or controlling 10% or more of the voting securities of the insurer or will not otherwise result in the health care corporation having control of the insurer, either before or after the effective date of the amendatory act that added subparagraph (*iv*). As used in this subparagraph and subparagraph (*iv*), "control" means that term as defined in section 115 of the insurance code of 1956, 1956 PA 218, MCL 500.115.
>
> (*iv*) Subject to section 218 [MCL 550.1218] and beginning on the effective date of the amendatory act that added this subparagraph, will not result in the health care corporation owning or controlling part or all of the insurer unless the transaction satisfies chapter 13 of the insurance code of 1956, 1956 PA 218, MCL 500.1301 to 500.1379, and the insurer being acquired is only authorized to sell disability insurance as defined under section 606 of the insurance code of 1956, 1956 PA 218, MCL 500.606, or under a statute or regulation in the insurer's domiciliary jurisdiction that is substantially similar to section 606 of the insurance code of 1956, 1956 PA 218, MCL 500.606.

Thus, the prohibition against "a health care corporation . . . indirectly engag[ing] in any investment activity that it may not engage in directly" was removed by the Legislature. It was replaced with a prohibition against an investment by a health-care corporation that would result in the corporation owning 10 percent or more of the voting securities of a particular insurer or "otherwise result[ing] in the health care corporation having [the prohibited level of] control

of" that insurer. As amended, then, MCL
550.1207(1)(o)(*iii*) is violated only when the health-
care corporation undertakes a financial transaction
that results in it having control of the acquired
insurer. Plainly, BCBSM did not itself acquire any
interest in or control of the three insurers at issue.
Thus, the conditions attendant to any such acquisi-
tion, set forth in subparagraphs (i)-(*iv*), were not
implicated.

Further, as the trial court noted, MCL 550.1207(1)(x)
provides, in relevant part, that BCBSM may

> establish, own, and operate a domestic stock insurance
> company [the Accident Fund] only for the purpose of
> acquiring, owning, and operating the state accident fund
> pursuant to chapter 51 of the insurance code of 1956 . . . so
> long as all of the following are met:
>
> (*i*) For insurance products and services the insurer
> *whether directly or indirectly* only transacts worker's com-
> pensation insurance and employer's liability insurance,
> transacts disability insurance limited to replacement of
> loss of earnings, and acts as an administrative services
> organization for an approved self-insured worker's com-
> pensation plan or a disability insurance plan limited to
> replacement of loss of earnings and does not transact any
> other type of insurance notwithstanding the authorization
> in chapter 51 of the insurance code of 1956 . . . This
> subparagraph does not preclude the insurer from providing
> either *directly or indirectly* noninsurance products and
> services as otherwise provided by law. [Emphasis added.]

Thus, the Act specifically authorizes the Accident Fund
to indirectly transact certain types of insurance, includ-
ing workers' compensation insurance, and to indirectly
provide noninsurance products and services as permit-
ted by law. We concur with the trial court's reasoning
that reading MCL 550.1207(1)(o) as implicitly prevent-
ing the acquisition of workers' compensation insurers

by the Accident Fund would be contrary to the language of MCL 550.1207(1)(x)(*i*), which explicitly permits such acquisitions.[5]

Plaintiff next argues that the trial court erred by dismissing count II of plaintiff's initial complaint and by referring the count to the OFIR Commissioner for a determination of whether BCBSM had violated the Act. We agree. The doctrine of primary jurisdiction permitted the trial court to refer the count to the OFIR Commissioner for an *advisory* opinion, but the trial court erred by failing to retain jurisdiction of the count and by failing to make a determination de novo of the statutory-interpretation issue.

In a convoluted argument, BCBSM argues that the doctrine of primary jurisdiction allows an administrative agency to issue a binding interpretation of a statute. This argument miscomprehends the doctrine. The applicability of the doctrine of primary jurisdiction presents a question of law, which this Court reviews de novo. *Psychosocial Serv Assoc, PC v State Farm Mut Auto Ins Co*, 279 Mich App 334, 336; 761 NW2d 716 (2008); *Mich Basic Prop Ins Ass'n v Detroit Edison Co*, 240 Mich App 524, 528; 618 NW2d 32 (2000). "The doctrine of primary jurisdiction is grounded in the principle of separation of powers. . . . [And it] is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 196-197; 631 NW2d 733 (2001) (quotation marks and citations omitted). As our

---

[5] Plaintiff does not allege that the three insurers acquired by the Accident Fund are engaged in providing insurance other than workers' compensation insurance in contravention of MCL 550.1207(1)(x)(*i*).

Supreme Court explained in *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 70-72; 559 NW2d 647 (1997):

> Primary jurisdiction "is a concept of judicial deference and discretion." LeDuc, Michigan Administrative Law, § 10:43, p 70. The doctrine exists as a "recognition of the need for orderly and sensible coordination of the work of agencies and of courts." *White Lake Improvement Ass'n v City of Whitehall*, 22 Mich App 262, 282; 177 NW2d 473 (1970). In *White Lake*, the Court of Appeals correctly noted that "[t]he doctrine of primary jurisdiction does not preclude civil litigation; it merely suspends court action." *Id.* at 271. Thus, LeDuc notes, "[p]rimary jurisdiction is not a matter of whether there will be judicial involvement in resolving issues, but rather of when it will occur and where the process will start." *Id.* at § 10:44, p 73. A court of general jurisdiction considers the doctrine of primary jurisdiction "whenever there is concurrent original subject matter jurisdiction regarding a disputed issue in both a court and an administrative agency." *Id.* at § 10:43, p 70.

> In *Attorney General v Diamond Mortgage Co*, 414 Mich 603, 613; 327 NW2d 805 (1982), we applied the United States Supreme Court's definition of the doctrine from *United States v Western P R Co*, 352 US 59; 77 S Ct 161; 1 L Ed 2d 126 (1956):

> " ' "Primary jurisdiction" . . . applies where a claim is originally cognizable in the courts and comes into play whenever enforcement of the claim *requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.*' "

> The Court observed, "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* at 64.

Professors Davis and Pierce identify three major purposes that usually govern the analysis when a court is deciding whether to defer to an administrative agency under this doctrine. First, a court should consider *"the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue . . . ."* Second, it should consider "the need for uniform resolution of the issue . . . ." Third, it should consider "the potential that judicial resolution of the issue will have an adverse impact on the agency's performance of its regulatory responsibilities." Davis & Pierce, 2 Administrative Law (3d ed), § 14.1, p 272. Where applicable, courts of general jurisdiction weigh these considerations and defer to administrative agencies where the case *is more appropriately decided* before the administrative body. [Emphasis added.]

As our Supreme Court has observed in *Travelers Ins Co*, the doctrine of primary jurisdiction

"reflects the courts' recognition that administrative agencies, created by the Legislature, are intended to be repositories of special competence and expertise uniquely equipped to examine the facts and develop public policy within a particular field." Thus, whether judicial review will be postponed in favor of the primary jurisdiction of an administrative agency "necessarily depends upon the agency rule at issue and the nature of the declaration being sought in the particular case."

\* \* \*

Several reasons have been advanced for invocation of the primary jurisdiction doctrine. First, the doctrine underscores the notion that administrative agencies *possess specialized and expert knowledge to address issues of a regulatory nature. Use of an agency's expertise is necessary in regulatory matters in which judges and juries have little familiarity. . . .* A second consideration relates to respect for the separation of powers and the statutory purpose underlying the creation of the administrative agency, the powers granted to it by the legislature, and the powers

withheld. This justification includes the principle that courts are not to make adverse decisions that threaten the regulatory authority and integrity of the agency. Third, the doctrine exists to promote consistent application in resolving controversies of administrative law. By application of the doctrine,

"[u]niformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, *by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.*"

In [*Attorney General v*] *Diamond Mtg Co* [414 Mich 603, 612-613; 327 NW2d 805 (1982)], this Court explained its adoption of these justifications for primary jurisdiction.

"*In cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion,* agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined."

Thus, this Court recognized application of the primary jurisdiction doctrine to all cases in which it was deemed that *an administrative agency possessed superior knowledge and expertise in addressing recurring issues within the scope of their authority.* [*Travelers Ins Co,* 465 Mich at 198-200 (emphasis added; citations omitted).]

The doctrine of primary jurisdiction is applicable where the issues presented are of a type that an administrative agency possesses superior knowledge and expertise over the courts and that involve a regulatory area unfamiliar to the courts. Consequently, referral to an agency is appropriate for " '*preliminary* resort for ascertaining and interpreting the circum-

stances underlying legal issues,' " to thereafter be decided by the courts. *Id.* at 199 (emphasis added; citation omitted).

As a threshold issue, before invoking the doctrine of primary jurisdiction, a court must find that the administrative agency to which referral is sought has concurrent original jurisdiction over the issues raised. Here, the trial court did not specifically determine that the OFIR had concurrent original jurisdiction over the question whether the $125 million capital contribution was an impermissible subsidy under MCL 550.1207(1)(x). Nonetheless, the implication of the trial court's referral is necessarily that the OFIR has such jurisdiction.

BCBSM acknowledges that "[r]esolution of the issues raised in Count II was and is dependent upon the proper construction of MCL 550.1207(1)(x)(*vi*)" and notes that in *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008), our Supreme Court held that courts should give " 'respectful consideration' " to the construction of a statute by an administrative agency charged with administering the statute and should not overturn the agency's interpretation without " 'cogent reasons.' " BCBSM then concludes that, "[g]iven the Commissioner's extensive experience in regulating the insurance and health care industries, and financial transactions between affiliated entities, the trial court properly gave to the Commissioner the initial opportunity to interpret Section 207, and this Court, respectfully, should not disturb that decision." However, BCBSM overstates the degree of consideration that is appropriately afforded to the OFIR Commissioner's determination on a question of statutory interpretation.

At issue in *In re Complaint of Rovas,* was whether SBC Michigan (SBC) violated § 502(1)(a) of the Michigan Telecommunications Act, MCL 484.2502(1)(a), by sending customers an erroneous bill. The customers filed a complaint with the Public Service Commission (PSC), which agreed with the customers that the erroneous bill constituted a violation. This Court had reluctantly affirmed, despite "reservations," concluding that the agency's interpretation of the statute was "plausible." *In re Complaint of Rovas,* 482 Mich at 93-94. Our Supreme Court reversed. It first noted:

> This case implicates the powers, and the boundaries of the powers, of all three branches: the Legislature, the judiciary, and administrative agencies, which are part of the executive branch. Thus, separation of powers principles will aid in the analysis of the proper consideration due an administrative agency's interpretation of a statute.

> The people of the state of Michigan have divided the powers of their government "into three branches: legislative, executive and judicial." Furthermore, "[n]o person exercising the powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

> "The legislative power of the State of Michigan is vested in a senate and a house of representatives." Simply put, legislative power is the power to make laws. In accordance with the constitution's separation of powers, this Court "cannot revise, amend, deconstruct, or ignore [the Legislature's] product and still be true to our responsibilities that give our branch only the judicial power." While administrative agencies have what have been described as "quasi-legislative" powers, such as rulemaking authority, these agencies cannot exercise legislative power by creating law or changing the laws enacted by the Legislature.

> Since the time of *Marbury v Madison* [5 US (1 Cranch) 137; 2 L Ed 60 (1803)], interpreting the law has been one of the defining aspects of judicial power. "Although we may not usurp the lawmaking function of the legislature, the

proper construction of a statute is a judicial function, and we are required to discover the legislative intent." Administrative agencies exercise what have been described as "quasi-judicial" powers. However, such power is limited and is not an exercise of constitutional "judicial power." The primary "judicial" function exercised by administrative agencies is confined to conducting contested cases, like the one at issue here. These administrative contested cases resemble trials. Constitutionally and statutorily, these administrative fact-finding exercises are entitled to a degree of deference defined by statute and our constitution. However, fact-finding in an administrative contested case, much like in a trial before a circuit court, is a far different endeavor than construing a statute. [*Id.* at 97-99.]

With these principles in mind, the Court explained the standard of review afforded by the courts to an agency's interpretation of a statute as follows:

[T]he Michigan Constitution specifically recognizes administrative agencies. Furthermore, the constitution explicitly provides for judicial review of administrative decisions . . . to determine: (1) that the decision is authorized by law, and (2) if a hearing is required, that the decision is supported by record evidence. However, the provision *does not stand for the proposition that agencies can assume this Court's constitutional role as the final arbiter of the meaning of a statute.*

\* \* \*

. . . This Court has uniformly held that statutory interpretation is a question of law that this Court reviews de novo. Thus, concepts such as "abuse of discretion" or "clear error," which are similar to the standards of review applicable to other agency functions, simply do not apply to a court's review of an agency's construction of a statute.

. . . While there are some opinions that seem to stand for the proposition that agency statutory interpretations are reviewed for "reasonableness" or an "abuse of discretion," those standards do not apply to the interpretation of a

statute, and *they threaten the separation of powers principles discussed earlier by allowing the agency to usurp the judiciary's constitutional authority to construe the law* and infringe on the Legislature's lawmaking authority.

* * *

This Court announced the proper standard of review for agency statutory construction more than 70 years ago in *Boyer-Campbell v Fry* [271 Mich 282, 296-297; 260 NW 165 (1935)], which dealt with the proper construction of the General Sales Tax Act. The *Boyer-Campbell* Court held that

"the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature."

This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. *However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue.* [*Id.* at 99-103 (emphasis added; citations and quotation marks omitted).]

In sum, then, contrary to BCBSM's assertion, " '[r]espectful consideration' is not equivalent to any normative understanding of 'deference' as the latter term is commonly used in appellate decisions," and " 'the agency's interpretation is not binding on this Court, and cannot be used to overcome the statute's plain mean-

ing.' " *Id.* at 105, 108 (citation omitted). It is the courts, not the OFIR, that have the ultimate authority over the statutory interpretation of the Act, and any statutory interpretation rendered by the OFIR Commissioner in this case is not binding on the court.

Therefore, the trial court erred when it failed to make an independent interpretation of the statute at issue in count II. Count II is remanded to the trial court; we direct the trial court to make an independent, de novo interpretation of the statute. The court must allow the parties an opportunity to present evidence and to fully brief the issue. The court may also invite and allow any appropriate entities to file amicus briefs.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Given our reversal with regard to count II, plaintiff's appeal of the trial court's dismissal of plaintiff's second complaint, at issue in Docket No. 295750, is rendered moot. We do not retain jurisdiction. Neither party having prevailed in full, there shall be no taxable costs.

MARKEY, J., concurred.

BANDSTRA, J. (*concurring in part and dissenting in part*). I concur with most of the majority opinion but disagree with its conclusion that the trial court should decide on remand a question that was raised on appeal, whether the $125 million capital contribution by Blue Cross Blue Shield of Michigan (BCBSM) to the Accident Fund Insurance Company of America (the Accident Fund) violated MCL 550.1207(1)(x). The majority directed a remand on this issue to allow the parties an opportunity to present evidence and fully brief it. However, the issue has been fully briefed, and no set of facts would justify the capital contribution under the clear language of the statute.

MCL 550.1207(1)(x) provides, in relevant part:

A health care corporation, subject to any limitation provided in this act, in any other statute of this state, or in its articles of incorporation, may do any or all of the following:

\* \* \*

(x) [E]stablish, own, and operate a domestic stock insurance company only for the purpose of acquiring, owning, and operating the state accident fund pursuant to chapter 51 of the insurance code of 1956 . . . so long as all of the following are met:

\* \* \*

(*vi*) Health care corporation and subscriber funds are *not used to operate or subsidize in any way* the insurer *including the use of such funds to subsidize contracts for goods and services.* This subparagraph does not prohibit joint undertakings between the health care corporation and the insurer to take advantage of economies of scale or arm's-length loans or other financial transactions between the health care corporation and the insurer. [Emphasis added.]

As the majority has noted, this Court's goal when interpreting a statute is to discern and give effect to the Legislature's intent. *Neal v Wilkes,* 470 Mich 661, 665; 685 NW2d 648 (2004). The intent of the Legislature is most reliably shown through the words used in the statute. *Id.* If the language in the statute is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and the statute must be enforced as written. *Turner v Auto Club Ins Ass'n,* 448 Mich 22, 27; 528 NW2d 681 (1995). Effect should be given to every phrase, clause, and word in the statute, and this Court will avoid a construction that would render any part of a statute surplusage or nugatory. *Herman v Berrien Co,* 481 Mich 352, 366; 750 NW2d

570 (2008). "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999). And, this Court "must consider both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme." *People v Williams*, 268 Mich App 416, 425; 707 NW2d 624 (2005). This Court may " 'consult dictionary definitions of terms that are not defined in a statute.' " *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006), quoting *People v Perkins*, 473 Mich 626, 639; 703 NW2d 448 (2005). However, "technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a; *Woodard*, 476 Mich at 561.

By its plain language, MCL 550.1207(1)(x)(*vi*) prohibits BCBSM funds from being used to "operate or subsidize in any way" the Accident Fund, "including the use of such funds to subsidize contracts for goods and services." *Random House Webster's College Dictionary* (1992), defines "any" as "one, a, an or some," or as "every, [or] all"; it defines "way" as "manner, mode, or fashion"; it defines "operate" as "to work, perform or function" or "to manage or use"; it defines "subsidize" as "to furnish or aid with a subsidy" and it defines "subsidy" as "any grant or contribution of money." Applying these definitions to § 207(1)(x)(*vi*) then, BCBSM is prohibited from using its funds to aid the Accident Fund with a grant or contribution of money, in any manner or fashion. Certainly, the $125 million nonrepayable contribution of BCBSM funds to the Accident Fund meets this definition.

BCBSM argues, and the commissioner of the Office of Financial and Insurance Regulation (OFIR) (the OFIR Commissioner) agreed, that the term "subsidize" as used in the statute refers only to "subsidization," an insurance industry term with a particular, technical meaning limited to *rate* subsidization and that it is only this particular activity that the Legislature intended to prohibit. See MCL 8.3a. However, even assuming "subsidization" might be interpreted that way, the statute does not merely prohibit "subsidization" and the restrictive connotation that BCBSM would have us impose is belied by the Legislature's use of the much broader "operate or subsidize in any way" phrase, as just explained.

Further, § 207(1)(x)(*vi*) states that BCBSM may not subsidize the Accident Fund by using BCBSM funds "to subsidize contracts for goods and services." Again, this is a broad phrase and there is no limiting language suggesting that the contracts that BCBSM cannot subsidize are only those contracts that would affect the Accident Fund's rates. Again, therefore, this broad statutory language is inconsistent with the reading of the statute that BCBSM urges on us; to accept BCBSM's argument would improperly render the broad statutory provision regarding "contracts for goods and services" surplusage or nugatory. *Herman*, 481 Mich at 366.

In sum, reading the prohibition against the use of BCBSM funds to subsidize in any way the Accident Fund, "in its grammatical context," *Sun Valley Foods*, 460 Mich at 237, and considering "both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme," *Williams*, 268 Mich App at 425, as this Court is required to do, the only conclusion that can be drawn from the plain language of

MCL 550.1207(1)(x)(*vi*) is that BCBSM is prevented from contributing its funds to the Accident Fund for any purpose, not merely for the purpose of subsidizing the Accident Fund's insurance rates.[1]

BCBSM further argues that the capital contribution constitutes a permissible "other financial transaction" within the meaning of § 207(1)(x)(*vi*). This argument also lacks merit. "Under the statutory construction doctrine known as ejusdem generis, where a general term follows a series of specific terms, the general term is interpreted 'to

---

[1] BCBSM asserts, and the OFIR Commissioner noted, that capital contributions between parent and subsidiary corporations are commonplace in the insurance industry. However, this has no bearing on the interpretation of the instant statutory provision, which regulates particularly *this* parent and *this* subsidiary in a very specific manner, considering the unique nature of BCBSM and its corresponding unique posture in the insurance market. Nor does the application of MCL 550.1207(1)(x)(*vi*) depend in any way on the motivation or purpose behind BCBSM's contribution to the Accident Fund. Rather, the statute prohibits BCBSM from aiding the Accident Fund financially in any manner or fashion.

BCBSM relies on the legislative history behind changes that were made to the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq.*, at the same time that the statute at issue was enacted. BCBSM cites old caselaw suggesting that legislative intent can appropriately be considered, *Girard v Wagenmaker*, 437 Mich 231, 238-239; 470 NW2d 372 (1991), but that caselaw has been seriously undermined by more recent authority stating that "in Michigan, a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction." *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180 (2001). In any event, as I have explained, the statute here is unambiguous and judicial construction of any sort, including through an analysis of legislative history, is neither required nor permitted. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005). That same rule applies to consideration of statutes or legislation that are *in pari materia*, a doctrine only to be utilized when "the statute under examination is itself ambiguous." *Tyler v Livonia Pub Sch*, 459 Mich 382, 392; 590 NW2d 560 (1999). For all these reasons, BCBSM's attempts to avoid the clear language of the statute, while creative, must fail.

include only things of the same kind, class, character, or nature as those specifically enumerated.' " *Neal*, 470 Mich at 669, quoting *Huggett v Dep't of Natural Resources*, 464 Mich 711, 718-719; 629 NW2d 915 (2001). Therefore, the language "other financial transactions" must be interpreted to include only those transactions of the same kind, class, character, or nature as "joint undertakings" to allow BCBSM and the Accident Fund to take advantage of economies of scale, or "arm's-length loans . . . ." MCL 550.1207(1)(x)(*vi*). Thus, the "other financial transactions" permitted by the statute are of the type that have direct, immediate, and concrete mutual economic/financial benefit. A transfer of $125 million from BCBSM to the Accident Fund, without any repayment obligation or direct benefit to BCBSM, regardless of the purpose, does not meet this criteria.

For these reasons, I would conclude, without remanding the issue, that BCBSM's $125 million contribution to the Accident Fund was impermissible under the plain language of MCL 550.1207(1)(x).