# STATE OF MICHIGAN

# COURT OF APPEALS

CARSON CITY HOSPITAL,

       Plaintiff-Appellant,

v

QUICK-SAV FOOD STORES, LTD, d/b/a
BEACON & BRIDGE MARKET,

       Defendant-Appellee.

UNPUBLISHED
April 28, 2016

No. 325187
Gratiot Circuit Court
LC No. 13-011830-CE

Before: SAWYER, P.J., and MURPHY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiff Carson City Hospital, which owns and operates the Ithaca Family Health Clinic, appeals as of right the trial court's order granting summary disposition in favor of defendant Quick-Sav Food Stores, Ltd., d/b/a Beacon & Bridge Market, pursuant to the doctrine of primary jurisdiction.[1] The dismissal was without prejudice. This case stems from a gasoline leak in connection with an underground storage tank (UST) located on the market's property, resulting in the release of at least 800 gallons of petroleum into the surrounding environment, including the clinic's property. Invoking the discretionary doctrine of primary jurisdiction, the trial court decided to defer, at least for now, to the expertise and ongoing involvement of the Michigan Department of Environmental Quality (MDEQ), which was acting pursuant to Chapter 8 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, in addressing the release and resulting contamination. The trial court denied the market's alternative motion for summary disposition under MCR 2.116(C)(8), as well as the clinic's partial motion for summary disposition under MCR 2.116(C)(10), on the basis that they were rendered moot given the court's jurisdictional ruling. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

The market operated a gas station and store, bordered to the north by the clinic. The market had two, 10,000 gallon USTs holding gasoline. In April 2010, the MDEQ inspected the market in relation to the USTs, checking for compliance with the NREPA. The MDEQ found a

---

[1] Hereafter, we shall refer to plaintiff as the "clinic" and defendant as the "market."

-1-

violation relative to the testing of a line leak detector, with the market being temporarily approved to continue operations, subject to correction of the violation within a month and annual testing of the line leak detectors. There does not appear to be any documentation in the record concerning any follow-up on that matter. The gasoline release at issue occurred thereafter on October 3, 2011, and the following passage comes from a Final Assessment Report (FAR), dated October 18, 2012, which was prepared for the MDEQ by August Mack Environmental, Inc., on behalf of the market:

> As described in the Initial Assessment Report (IAR) submitted to the . . . MDEQ on January 20, 2012, a suspected release was reported on October 3, 2011[,] associated with a broken leak detector. No visible product was detected in the observation wells at that time. Following an examination of the tank system, it was determined that the leak took place via a broken leak detector in the sump containing the submersible pump for the premium fuel . . . UST. The damage was promptly repaired by . . . [the market] and a tightness test was conducted following the repairs.

> In October 2011, the presence of petroleum vapors was reported in several homes and businesses in the vicinity of the Site and the release was considered "confirmed" by the MDEQ. The observation wells in the vicinity of the UST system were subsequently pumped to remove impacted groundwater. A second tank tightness test was conducted on October 21, 2011, and the tanks and lines were confirmed tight. No free product was identified during the repairs or subsequent environmental activities.

> The City of Ithaca continued to receive sporadic complaints of petroleum vapors in homes and businesses in the vicinity of the Site in October and November 2011. The source of the vapors appeared to be associated with impacted groundwater in the vicinity of the UST that entered the sewer or sewer utility trench.

The market's FAR indicated that air monitoring and sampling had revealed unacceptable concentrations of benzene, a hydrocarbon and constituent of crude oil, inside the clinic, and a mitigation system was installed in the clinic in January 2012, followed by ongoing air monitoring and sampling. The FAR also revealed that soil sampling had been conducted, entailing the examination and analysis of soil borings, along with groundwater testing, with respect to the market and the clinic's properties. The FAR concluded, "Based on the findings of the investigative activities, petroleum COC [constituents of concern] impacted soil and groundwater is present in the northern portion of the Site and the southern portion of the north adjacent property (Ithaca Family Health [Clinic])." In a "notice to impacted parties of corrective action" prepared by the market on an MDEQ form and addressed to the clinic, the clinic was informed that a gasoline release had occurred at the market, that the release had impacted the clinic's property, that the groundwater at the clinic was contaminated with petroleum, and that soil at the clinic was also contaminated with petroleum.

Sean Robinson, a project manager with AKT Peerless Environmental Services (AKT), conducted environmental-assessment and document-review activities for the clinic, and in Robinson's affidavit of environmental condition, dated August 12, 2014, he averred:

> On September 26, 2012[,] soil sampling was conducted by AKT . . . within the [clinic] building. During sampling, the concrete floor within a[] [clinic] patient examination room was penetrated to allow an evaluation of the underlying soils. Upon penetration of the concrete floor, a strong and clearly discernible odor of gasoline was immediately identified by AKT . . . and [clinic] staff throughout the [clinic] building. Soil samples collected from immediately beneath the [clinic] exhibited obvious evidence of the presence of gasoline. Soil samples were submitted by AKT . . . to an independent laboratory for qualitative analysis of the presence of gasoline related chemical constituents. The laboratory results indicated the presence of various gasoline constituents above the MDEQ Risk Based Screening Levels . . . in accord with . . . Part 213 of the NREPA, which indicates the presence of soil contamination directly beneath the [clinic] building. . . . There is no documentation that the soil contamination identified during the AKT . . . investigation has been reduced.

The laboratory results were attached to Robinson's affidavit. In regard to the leak on October 3, 2011, Robinson opined that "[t]he series of events would suggest that inappropriate leak detection testing and maintenance resulted in the release and increased the duration and volume of the gasoline released." Robinson also asserted that the market's FAR had not been completed within one year of the gasoline release as mandated by Part 213 of the NREPA, MCL 324.21301a *et seq*. He also averred that given the suspected release date of October 3, 2011, and the confirmed release date of October 21, 2011, the confirmation did not occur within the 14-day timeframe required by Part 211 of the NREPA, MCL 324.21101 *et seq*.

The market's FAR set forth a remediation strategy and corrective action plan (CAP), which encompassed the recordation of deed restrictions in regard to the market's property, limited excavation and removal of impacted soil along the market's northern boundary and in the area of the USTs, the installation and operation of a multiphase vapor extraction and air sparging system, and monitored natural attenuation. The market's notice sent to the clinic, referenced earlier, listed the following proposed corrective actions concerning the clinic's property: deed restrictions; groundwater capture and treatment; limited soil excavation; and soil vapor extraction.

The clinic alleged in its complaint that the market's FAR "was not accepted as final by the MDEQ" and that the MDEQ permitted the market "to resubmit a second, amended FAR" on April 9, 2013. It does not appear that the market's amended FAR was ever made part of the lower court record. However, an amended FAR was clearly prepared on behalf of the market and submitted to the MDEQ, given that an MDEQ letter dated May 30, 2013, and addressed to the market referred to an MDEQ audit of a FAR received by the MDEQ from the market on April 10, 2013. The letter revealed that the MDEQ's Remediation and Redevelopment Division had conducted an audit of the FAR pursuant to the NREPA, which audit consisted of a review of the FAR, as amended, examination of district file documents, and peer review. The audit resulted in a conclusion that the corrective actions and testing enumerated in the FAR that had

been undertaken by or on behalf of the market in addressing the release and that were proposed in the future were not in compliance with Part 213 of the NREPA. And the audit letter, in denying and criticizing the FAR, identified an extensive number of asserted deficiencies, detailing and explaining the deficiencies, along with setting forth recommendations that might correct the deficiencies. The audit letter directed the market to "provide a written commitment within 21 days to revise and resubmit the report[,]" and it informed the market that "[t]he commitment should include a schedule for conducting the additional corrective action activities and revised report submittal." The audit letter further indicated that if the market disagreed with the audit, the market could submit a petition for review to the Response Activity Review Panel or submit a petition for an administrative contested-case hearing. At the time that summary disposition briefs were filed below, July and August 2014, the parties indicated that a FAR approved by the MDEQ had not yet been issued. Indeed, the record does not reveal whether the market had submitted a revised FAR or whether it had even submitted a written commitment to revise its FAR. Nothing in the record suggests that the market had filed a petition for review or contested-case hearing, challenging the audit.

In Sean Robinson's affidavit, he indicated that the market had financed the installation of a vapor mitigation system at the clinic, which prevented the accumulation of unsafe vapors within the clinic and vented the vapors outside. Robinson claimed, however, that the vapor mitigation system was merely an interim measure and was not intended or designed to remediate the contamination. He averred that all of the cleanup planning advanced by or on behalf of the market in order to achieve regulatory compliance would, if carried out, still leave significant soil and groundwater contamination at the clinic. Robinson opined that "[b]ased on the contents of various documents and correspondence[, including the audit,] prepared regarding the release, there has been no implicit or explicit plan to effectively remediate gasoline contamination to pre-release conditions." He averred that the contamination placed legal obligations on the clinic itself, reduced the value of the clinic's property, and decreased the potential alternatives concerning the future use of the clinic's property.

On September 9, 2013, the clinic filed the instant lawsuit against the market. The general allegations addressed the history of the release, the nature of the contamination, and the market's remediation and corrective action efforts, with the clinic essentially asserting that the market was liable for the release and resulting contamination and that the market's response had been woefully inadequate, as reflected in the MDEQ's audit, all leading to extensive injuries and damages to the clinic's property and its operations. Count I of the complaint alleged economic damages and costs incurred by the clinic due to the contamination of its property. Count II alleged reckless and wrongful conduct by the market and entitlement to compensation for the contamination under Part 201 of the NREPA, MCL 324.20101 et seq. Count III alleged gross negligence by the market in relation to the release and response. Count IV alleged a claim of trespass, given the petroleum's intrusion on the clinic's property. Count V alleged that the market had created a nuisance by way of the release and contamination. Count VI alleged statutory liability under MCL 324.20126a and strict liability. And count VII sought a preliminary and permanent injunction to halt the market's sale of gas until it could demonstrate the ability to properly maintain the USTs and to compel the market to clean up and eliminate the contamination of the clinic's property.

The market filed an answer and affirmative defenses, which included an assertion that the clinic's claims were under the primary jurisdiction of the MDEQ. The market subsequently filed a motion for summary disposition, arguing that the clinic's complaint should be dismissed under MCR 2.116(C)(4) (lack of subject-matter jurisdiction) pursuant to the doctrine of primary jurisdiction, which would still allow the clinic to bring suit in the future after the MDEQ had finalized its management of the matter. In the alternative, the market argued that the action should be dismissed under MCR 2.116(C)(8) (failure to state a claim). The market contended that there is no independent cause of action for economic damages and costs (count I), that Part 201 of the NREPA no longer applied to leaking USTs (count II), that the clinic had not alleged a present-physical-injury element as necessary to succeed on a negligence or gross negligence claim (count III), that there was no intent to intrude, nor did the contaminants qualify, for purposes of showing trespass (count IV), that there was no basis for a nuisance claim, given the lack of a significant interference with the clinic's use and enjoyment of its property (count V), that strict liability did not apply (count VI), and that the MDEQ was the proper entity to address equitable-type relief (count VII).

Before responding to the market's motion for summary disposition, the clinic filed a motion to extend the case schedule, attaching two notices of intent to sue that were served on the Attorney General and the director of the MDEQ, with one notice indicating a plan to amend the complaint in this action to add state parties and the other indicating an intent to file a separate action that named state parties as defendants. Thereafter, on August 12, 2014, the clinic filed a motion for partial summary disposition under MCR 2.116(C)(10) with respect to liability for the release and contamination. On August 25, 2014, the market filed a brief in opposition to the clinic's motion for partial summary disposition. In late August and mid-September 2014, the clinic filed a response brief to the market's motion for summary disposition and a reply brief to address the market's response to the clinic's motion for partial summary disposition. We shall discuss below the clinic's arguments posed in its response brief with respect to the doctrine of primary jurisdiction, but only to the extent that the arguments are raised again in the clinic's appellate brief.

At a hearing on September 15, 2014, the trial court was prepared to entertain the competing motions for summary disposition and the clinic's motion to extend the case schedule. At the hearing, the clinic's counsel told the trial court that it might wish to only address the motion to extend the case schedule, given that it concerned potentially adding third parties in an amended complaint. The trial court then stated that it would "enter an amended scheduling conference order," which never did occur, and that it would take the summary disposition motions "under advisement," while allowing the motions to be renoticed for hearing after expiration of "the scheduling conference order." The trial court responded, "Okay," when the clinic's counsel observed that the extension of the case "schedule would be to incorporate to make sure we have all the parties in the overall litigation." There was no substantive argument on the motions for summary disposition, and no written order actually emanated from this hearing.

On October 2, 2014, the clinic filed a motion for leave to amend its complaint to add the MDEQ, the MDEQ's director, and certain unknown contractors and vendors of the MDEQ as defendants in the action. The clinic attached a proposed amended complaint reflecting the new parties and entailing modifications and additions to the existing allegations. On October 28,

2014, the trial court, absent any new hearing, issued a written opinion on the competing motions for summary disposition.[2] The trial court granted the market's motion for summary disposition under MCR 2.116(C)(4), without prejudice, pursuant to the doctrine of primary jurisdiction, reasoning as follows:

> This Court is satisfied that the primary jurisdiction doctrine should be applied in this case as a matter of judicial discretion. The following factors counsel the Court to do so.
>
> First, MDEQ was the agency properly engaged by the parties at the outset of this dispute.
>
> Second, that agency has specialized expertise and resources in addressing environmental contamination and site remediation.
>
> Third, as demonstrated by the attachments to the pleadings in this case that agency has devoted a significant amount of time and effort to determine factually the cause of the release and the extent of the damage.
>
> Fourth, deferring to the MDEQ primary jurisdiction will provide a measure of uniformity and consistency in administrative regulation of environmental hazards.
>
> Fifth, deferring to the agency will effectuate coordination of judicial and agency resources in dealing with the multitude of aspects of a single event.
>
> Sixth, separation of judicial and legislative/executive powers is fostered by the Court awaiting the outcome of administrative investigations, remedies, and sanctions[.]
>
> Seventh, judicial resolution of issues legislatively entrusted to MDEQ could adversely intrude upon the administrative body's responsibilities.

Finding them to be moot given the primary jurisdiction ruling, the trial court proceeded to deny the market's motion for summary disposition under MCR 2.116(C)(8) and the clinic's motion for partial summary disposition under MCR 2.116(C)(10).

On November 18, 2014, the clinic filed a motion for rehearing and reconsideration. In the motion, the clinic noted its earlier motions to extend the case schedule and to amend the complaint, questioning the court's failure to abide by its own ruling from the bench back on September 15, 2014. The clinic also indicated in the motion for rehearing and reconsideration that it had filed a separate action, lower court docket no. 14-11926-CE, against the market, the

---

[2] The record does not reflect that the trial court had ruled on the clinic's motion to amend its complaint, nor had an amended scheduling order been entered.

MDEQ, the MDEQ director, and unknown MDEQ vendors and contractors, which apparently mimicked the proposed amended complaint in the present action. The clinic complained that the trial court, absent following through on extending the case schedule and permitting an amended complaint, proceeded to issue its opinion and order relative to the summary disposition motions "without notice or oral arguments." The clinic also assailed the trial court's primary jurisdiction ruling. On December 4, 2014, the trial court issued a short opinion and order denying the clinic's motion for rehearing and reconsideration. The trial court noted that it had reviewed the pleadings in the separate action against the market, the MDEQ, and the MDEQ-related parties (hereafter referred to as the "2014 case"). The trial court concluded that the clinic was not entitled to relief under MCR 2.119(F), that the instant case was closed, and that the 2014 case remained pending.[3] The clinic appeals as of right, challenging the trial court's order summarily dismissing the action under MCR 2.116(C)(4) pursuant to the doctrine of primary jurisdiction.

## II. ANALYSIS

## A. STANDARD OF REVIEW

"The applicability of the doctrine of primary jurisdiction presents a question of law, which this Court reviews de novo." *Attorney General v Blue Cross Blue Shield of Mich*, 291 Mich App 64, 84; 810 NW2d 603 (2010); see also *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205-206 n 18; 631 NW2d 733 (2001); *Psychosocial Serv Assoc, PC v State Farm Mut Auto Ins Co*, 279 Mich App 334, 336; 761 NW2d 716 (2008). MCR 2.116(C)(4) provides for summary disposition when a "court lacks jurisdiction of the subject matter." However, the doctrines of primary jurisdiction and subject-matter jurisdiction are not the same. MCR 2.116(C)(4) is inapplicable in regard to primary jurisdiction, "not only because the doctrines are distinct, but also because invocation of primary jurisdiction is not the equivalent of summary disposition as the latter represents a final disposition of a claim while the former merely defers a claim to an administrative agency." *Travelers Ins*, 465 Mich at 205-206 n 18. Indeed, "the

---

[3] The lower court record contains transcripts of a motion for summary disposition held on December 15, 2014, and a continued motion for summary disposition held on February 3, 2015, which, although marked on their cover pages as pertaining to this case, actually concerned the 2014 case, as evidenced by the discussion and statements made at the hearings. The 2014 case was also summarily dismissed, but apparently only with respect to the state parties, on the basis that the Court of Claims alone had jurisdiction over the issues related to those parties. This Court dismissed the clinic's appeal of right in the 2014 case, explaining that the trial court's order granting the state parties summary disposition was not a final order appealable by right, because it did not dispose of the claims against the market. *Carson City Hosp v Quick-Sav Food Stores, Ltd*, unpublished order of the Court of Appeals, entered December 2, 2015 (Docket No. 328619). The motion panel stated that "it is immaterial if the substantive content of those claims [against the market] is entirely or substantially the same as that of the claims appellant brought against that party in the prior case at issue in the pending appeal in Docket Number 325187 [our case and appeal] because an order in that prior case simply did not – and could not have – disposed of claims in this case." *Id.*

doctrine of primary jurisdiction is not a defense, but rather a doctrine of judicial deference and discretion[.]" *Id.* at 211. Accordingly, the trial court erred in citing MCR 2.116(C)(4) in its opinion, but the error was harmless, MCR 2.613(A), given that it did not ultimately affect the court's analysis and imposition of the doctrine of primary jurisdiction.

## B. THE DOCTRINE OF PRIMARY JURISDICTION

"The doctrine of primary jurisdiction is grounded in the principle of separation of powers" and "has been compared to the political question doctrine and the exhaustion doctrine, both of which are also concepts rooted in separation of powers principles." *Travelers Ins*, 465 Mich at 196. The *Travelers Ins* Court elaborated:

> The doctrine of primary jurisdiction . . . reflects practical concerns regarding respect for . . . [an] agency's legislatively imposed regulatory duties. Adhering to the doctrine of primary jurisdiction reinforces the expertise of the agency to which the courts are deferring the matter, and avoids the expenditure of judicial resources for issues that can better be resolved by the agency. A question of primary jurisdiction arises when a claim may be cognizable in a court but initial resolution of issues within the special competence of an administrative agency is required. [*Id.* at 197 (citations and quotation marks omitted).]

The doctrine of primary jurisdiction reflects a recognition by the courts that legislatively-created administrative agencies are intended to be repositories of expertise and special competence uniquely equipped to examine facts and develop public policy within a particular field. *Id.* at 198. Our Supreme Court further explained:

> Several reasons have been advanced for invocation of the primary jurisdiction doctrine. First, the doctrine underscores the notion that administrative agencies possess specialized and expert knowledge to address issues of a regulatory nature. Use of an agency's expertise is necessary in regulatory matters in which judges and juries have little familiarity. Thus, the doctrine is principally applicable to controversies involving regulatory agencies. A second consideration relates to respect for the separation of powers and the statutory purpose underlying the creation of the administrative agency, the powers granted to it by the legislature, and the powers withheld. This justification includes the principle that courts are not to make adverse decisions that threaten the regulatory authority and integrity of the agency. Third, the doctrine exists to promote consistent application in resolving controversies of administrative law. By application of the doctrine,
>
> "[u]niformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." [*Id.* at 198-199 (citations omitted).]

There is no fixed formula for applying the doctrine, and in all cases the question with respect to whether the doctrine should be applied is whether the reasons for the doctrine's existence are present and whether the purposes served by the doctrine would be aided by its application in the particular litigation. *Id.* at 198. Primary jurisdiction is concerned with judicial deference and discretion, it is not a matter of whether there will be judicial involvement in resolving a case, but instead pertains to when it will occur and where it will start, and primary jurisdiction must be considered by courts of general jurisdiction whenever concurrent original subject matter jurisdiction relative to a disputed issue exists in both a court and administrative agency. *Rinaldo's Constr Corp v Mich Bell Telephone Co*, 454 Mich 65, 70; 559 NW2d 647 (1997). Under the doctrine of primary jurisdiction, referral to an administrative agency is proper for preliminary resort to ascertain and interpret the circumstances underlying the legal issues to be decided by the courts. *Attorney General*, 291 Mich App at 87-88. But before invoking the doctrine, "a court must find that the administrative agency to which referral is sought has concurrent jurisdiction over the issues raised." *Id.* at 88.

## C. NREPA PROVISIONS

Chapter 8 of the NREPA governs USTs, and the chapter is comprised of Part 211, MCL 324.21101 *et seq.*, which concerns UST regulations, and Part 213, MCL 324.21301a *et seq.*, which regards leaking USTs. MCL 324.21301a(1) states that Part 213 "is intended to provide remedies using a process and procedures separate and distinct from the process, procedures, and criteria established under part 201 [general environmental remediation] for sites posing a threat to the public health, safety, or welfare, or to the environment, as a result of releases from underground storage tank systems."[4] Subject to a variety of seemingly inapplicable exceptions, "persons [who] are liable under" Part 213 include "[t]he owner or operator [of a UST system] if the owner or operator is responsible for an activity causing a release . . . ." MCL 324.21323a(1)(a). In establishing this liability under § 21323a, the MDEQ has the burden of proof. MCL 324.21323a(6). MCL 324.21307 dictates the initial response actions to be taken by an owner or operator upon confirmation of a release from a UST, setting forth various duties and obligations. MCL 324.21308a requires preparation of an IAR[5] by or on behalf of the owner or operator. When initial response actions "have not resulted in completion of corrective action,"

---

[4] Amendments and additions were made to Part 213 pursuant to 2012 PA 108 and 446, which was after the petroleum release occurred in this case. However, the "liability provisions" in Part 213, as amended in 2012, are to "be given retroactive application." MCL 324.21301a(2). Part 201 on environmental remediation had effectively filled a variety of gaps in the pre-2012 version of Part 213, with 2012 PA 108 and 446 directly addressing those gaps by adding language and provisions to Part 213 while removing any further applicability of Part 201 as to UST leaks. Any differences between the pre- and post-2012 versions of Part 213 are not relevant in resolving the issue on appeal, and again, new liability provisions were made retroactive, thereby covering the 2011 gasoline release.

[5] As referenced earlier, an IAR is an Initial Assessment Report, and the market's FAR mentioned that its IAR had been submitted to the MDEQ on January 20, 2012, approximately three months after the release.

the owner or operator must have a CAP prepared "to address contamination at the site." MCL 324.21309a(1).[6] Pursuant to MCL 324.21311a(1), within 365 days of the discovery of a release, the owner or operator must complete a FAR that includes the CAP required under MCL 324.21309a and submit it to the MDEQ. Here, the market submitted a FAR dated October 18, 2012, to the MDEQ, and it contained a CAP. When corrective action is finalized and completed, the owner or operator is required to submit a closure report to the MDEQ. MCL 324.21312a. A closure report had not yet been prepared or submitted in this case at the time of summary disposition, given that the MDEQ had exercised its audit authority under MCL 324.21315, denied the amended FAR pursuant to the audit, and was awaiting a revised FAR or some other action by the market.

Pursuant to MCL 324.21319a(2), the MDEQ "may issue an administrative order to an owner or operator that is liable under section 21323a requiring that person to perform corrective actions relating to a site, or to take any other action required by" Part 213 of the NREPA. Under MCL 324.21323, the Attorney General, on behalf of the MDEQ, has authority to commence a civil action seeking a temporary or permanent injunction, the recovery of costs incurred by the state for taking corrective actions, an award of damages for injury done to the state's natural resources, a declaratory judgment with regard to liability for future corrective actions, and a civil fine for noncompliance with Part 213. MCL 324.21323b(1)(b) and (c) provide that "a person who is liable under section 21323a is jointly and severally liable for . . . [a]ll costs of corrective action reasonably incurred under the circumstances by any . . . person[,]" and for "[d]amages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release." The suit may be "brought by the state or any other person." MCL 324.21323b(7). Equitable relief against an owner or operator relative to Part 213 is available to a person in a court action under MCL 324.21323j.

## D. DISCUSSION

In its complaint, the clinic sought, under various theories and causes of action, equitable remedies, including orders for the market to take remedial measures and corrective actions so as to fully and properly address the contamination, damages to cover response costs incurred by the

---

[6] Corrective action activities undertaken pursuant to Part 213 must be conducted in accordance with the process outlined in the RBCA, so as to protect the public health, safety, and welfare, as well as the environment. MCL 324.21304a(1). The RBCA is "the American society for testing and materials . . . document entitled standard guide for risk-based corrective action applied at petroleum release sites[.]" MCL 324.21303(f). A "corrective action" is defined in MCL 324.21302(h) as follows:

> [The] investigation, assessment, cleanup, removal, containment, isolation, treatment, or monitoring of regulated substances released into the environment from an underground storage tank system that is necessary under this part to prevent, minimize, or mitigate injury to the public health, safety, or welfare, the environment, or natural resources.

clinic, damages for alleged business and property-value losses, and declaratory relief relative to the market's obligations in connection with ongoing and future corrective actions and costs associated with the contamination. Given the relief sought by the clinic, we are compelled to conclude that the trial court properly invoked the doctrine of primary jurisdiction. Were the litigation solely concerned with civil liability and basic causation issues, then perhaps it would have been appropriate for the trial court to exercise its jurisdiction, where the MDEQ's role at the time of summary disposition would not have necessarily affected resolution of or conflicted with those matters.[7] However, considering the stage of the MDEQ's involvement at the time of summary disposition, litigation entailing a potential award of damages to compensate the clinic for response costs, lost business, or diminution in property value, as well as equitable or declaratory relief with respect to remediation and corrective actions, was simply premature and could have undermined and conflicted with determinations yet to be made by the MDEQ. When summary disposition was granted, the market had not submitted a FAR or CAP that found approval with the MDEQ. Therefore, the full extent of corrective actions and remediation demanded of the market by the MDEQ remained unknown and could have eventually been inconsistent with or adverse to equitable relief ordered by the trial court had it exercised jurisdiction or inconsistent with or adverse to monetary damages awarded on the basis of response costs and business and property-value losses. For example, on the issue of damages for an alleged loss in the value of the clinic's property, the possibility existed that the MDEQ would approve a FAR/CAP submitted by the market that bore directly on the property's value by decreasing or eliminating the contamination if successfully executed by the market or its contractors, thereby making any damage assessment by the trier of fact problematic. With respect to judicial declaratory relief regarding the market's ongoing and future obligations concerning the contamination, a real danger would have existed of inconsistencies arising between rulings by the trial court and directives set forth by the MDEQ, threatening the MDEQ's regulatory authority.

There can be no reasonable dispute that the MDEQ is the repository of expertise and special competence in regard to a petroleum release from a UST, as reflected in Part 213 of the NREPA, and that it is uniquely equipped to examine the facts of a release and to address and guide the proper response to a release. *Travelers Ins*, 465 Mich at 198. The MDEQ is specifically charged with applying, implementing, executing, and enforcing Part 213. A failure to invoke the doctrine of primary jurisdiction under the circumstances would have been disrespectful to the principle of separation of powers and the purpose underlying the creation of the MDEQ. *Id.* at 199. Further, for the reasons discussed above, invocation of the doctrine by the trial court promoted the concepts of consistency and uniformity in the application of

---

[7] The clinic does not challenge the trial court's ruling denying its motion for partial summary disposition under MCR 2.116(C)(10) in regard to the issue of liability. We note that our review is focused on the period in which summary disposition was argued and granted, and our resolution of the issue of primary jurisdiction is confined to that temporal context. A great deal of time has passed since then, and if circumstances have changed in regard to the MDEQ proceedings that might bear on the application of the doctrine of primary jurisdiction today, it is a matter for the trial court to entertain in a renewed or revived action by the clinic

resolving controversies entangled by administrative law. *Id.* Under the trial court's ruling, the judiciary's role was more rationally exercised, given preliminary resort to the MDEQ for ascertaining and construing the circumstances underlying the legal issues posed in this case, primarily in regard to issues concerning and impacting the equitable, declaratory, and monetary relief sought by the clinic. *Id.*; *Attorney General*, 291 Mich App at 87-88. The trial court did not err in applying the doctrine of primary jurisdiction.

We shall briefly address the appellate arguments posed by the clinic. The clinic initially contends that the trial court had sole, not concurrent, jurisdiction over its common-law and equitable claims, which were ripe for adjudication. This argument misconstrues the directive in *Attorney General*, 291 Mich App at 88, that before invoking the doctrine of primary jurisdiction, "a court must find that the administrative agency to which referral is sought has concurrent jurisdiction *over the issues* raised." (Emphasis added.) As observed in *In re Application of Int'l Transmission Co*, 304 Mich App 561, 573; 847 NW2d 684 (2014), "[p]rimary jurisdiction 'does not involve jurisdiction in the technical sense.' " (Citation omitted.) Both *Travelers Ins* and *Rinaldo's Constr*, opinions issued by our Supreme Court, spoke in terms of concurrent jurisdiction over disputed issues, not causes of action. *Travelers Ins*, 465 Mich at 197; *Rinaldo's Constr*, 454 Mich at 70. The MDEQ, of course, does not have jurisdiction to adjudicate causes of action such as trespass, nuisance, and gross negligence, or even a civil action provided for in Part 213. The clinic has not directed us to any authority indicating that the doctrine of primary jurisdiction requires an administrative agency to have jurisdictional authority identical to that possessed by a court on every element of a cause of action. Rather, as pertinent to this case, it sufficed that the MDEQ had jurisdiction *over issues* concerning a leak from a UST, including determining the proper response to a petroleum leak from a UST and the resulting contamination, assessing IARs, FARs, and CAPs proffered by owners and operators of UST systems, and directing actions to protect the environment and public health, safety, and welfare.

The clinic argues that the doctrine of primary jurisdiction cannot be employed in the context of a tort claim or allegations of tortious conduct. In addressing the doctrine relative to the Michigan Public Service Commission (MPSC), the Supreme Court in *Rinaldo's Constr*, 454 Mich at 75, observed that "[t]he complexities of the regulatory scheme *will generally not be implicated* where the plaintiff's claim is for personal injury, property damage not covered by the [MPSC] tariffs, or other tortious activity, because the regulatory scheme is not designed to address these matters." (Emphasis added.) See also *Mich Basic Prop Ins Ass'n v Detroit Edison Co*, 240 Mich App 524, 535; 618 NW2d 32 (2000) (rejecting application of the doctrine where the plaintiffs had alleged that DTE "had a duty to handle electrical power transmission equipment in a safe and reasonable manner and that [DTE] breached this duty resulting in a fire that damaged the insured's property"). As reflected in *Rinaldo's Constr*, the general rule is not inflexible or insurmountable, such that the complexities of a regulatory scheme will never be implicated in regard to a tort action. And for the reasons discussed at length earlier in this opinion, the complexities of Part 213 of the NREPA are indeed implicated in connection with the tort remedies sought by the clinic in this case, keeping in mind the open-ended status of the MDEQ proceedings at the time of summary disposition. The regulatory scheme in Part 213 is designed to address matters regarding the nature and extent of corrective actions in combating contamination from leaking USTs, which necessarily has a direct bearing on the tort remedies sought by the clinic. Such an interrelationship simply did not exist in *Rinaldo's Constr* and *Mich Basic Prop*.

The clinic's argument that the MDEQ cannot provide an administrative remedy for its tort claims, i.e., an award of damages, again misses the point that the doctrine of primary jurisdiction does not require an administrative agency to have all of the tools wielded by a court in fashioning a remedy. The clinic also contends that the MDEQ cannot provide equitable relief. This argument lacks merit. The entire framework of Part 213 under which the MDEQ demands, monitors, evaluates, audits, and can reject CAPs and FARs effectively gives the MDEQ control to direct the actions and conduct of an owner or operator reminiscent of a trial court's equitable powers. Moreover, as recited above, the MDEQ has the authority to issue administrative orders requiring corrective actions related to a contaminated site. MCL 324.21319a(2). And the MDEQ itself is authorized to enter private property at reasonable times to take corrective action. MCL 324.21326(2)(f).

The clinic next maintains that the MDEQ failed to timely enforce the NREPA against the market, creating an urgency for a court to adjudicate the clinic's common-law and equitable claims. We can somewhat sympathize with the clinic, considering that, as best we can glean from the record, there did not appear to be much if any movement on the preparation of an acceptable FAR/CAP from the date of the audit letter until the order granting summary disposition was entered nearly 15 months later. However, in light of very little discussion on the matter by the parties below in their briefs and pleadings, and a lack of documentary evidence on the subject, we simply do not know what transpired between the MDEQ and the market during that span of time. As a general observation, we do believe that a lack of timeliness in exercising statutory duties by an administrative agency should be a consideration in deciding whether to apply the doctrine of primary jurisdiction, along with the more important criteria enumerated in *Travelers Ins*, 465 Mich 185. In the instant case, however, we can only speculate with respect to apparent delays in the administrative process, and the factors to be contemplated in determining whether the doctrine of primary jurisdiction should be invoked weigh heavily in favor of applying the doctrine. We also note that there existed avenues for the clinic to press the MDEQ into action, including MCL 324.21323j(1)(c) and (2), which allow a person adversely affected by a UST release to pursue a civil action in circuit court against MDEQ directors for purposes of obtaining an order requiring the MDEQ to perform nondiscretionary acts or duties mandated by Part 213.[8]

The preceding discussion concerning the doctrine of primary jurisdiction and administrative delay does give us some pause with respect to statute of limitations issues. In *Travelers Ins*, our Supreme Court indicated that a trial court invoking the doctrine has the discretion to simply stay the judicial proceedings, retain jurisdiction, and await anticipated administrative determinations, or it can dismiss the case without prejudice, as occurred here, "if

---

[8] The clinic's proposed amended complaint that never came to fruition sought declaratory relief, mandamus, and superintending control against the MDEQ for an alleged failure to enforce Part 213 of the NREPA. To the extent that the clinic suggests that the proposed amended complaint was accepted and part of this lawsuit, we reject the suggestion. The trial court ultimately did not grant the clinic's motion for leave to amend its complaint, and the court's summary disposition ruling clearly did not encompass the proposed amended complaint, only the original complaint.

the parties would not be unfairly disadvantaged." *Id.* at 207. A stay of proceedings, as opposed to a dismissal without prejudice, would alleviate any potential problems with regard to a claim becoming time-barred while administrative proceedings were being conducted. The clinic, however, presents no argument seeking reversal of the dismissal without prejudice on the basis that a stay would have been the more appropriate mechanism to implement the doctrine of primary jurisdiction. Nor does the clinic raise any concerns about the statute of limitations applicable to its various claims.[9] We decline to sua sponte examine whether a stay should have been ordered by the trial court.

Finally, the clinic devotes a significant portion of its appellate brief to arguing that each of the counts alleged in its complaint were legally sound and valid. The issue regarding whether the clinic stated claims upon which relief could be granted, MCR 2.116(C)(8), is not relevant at this time in light of the fact that the trial court denied the market's motion for summary disposition under MCR 2.116(C)(8) as moot and that the market has not cross appealed the ruling or argued that MCR 2.116(C)(8) provides an alternative basis to affirm.[10]

### III. CONCLUSION

The trial court did not err in invoking the doctrine of primary jurisdiction in this case, given the unresolved matters existing within the parameters of the MDEQ proceedings concerning the full extent of the remedial measures and corrective actions to be demanded and taken in connection with the UST release, which necessarily has a bearing on issues regarding the remedies sought by the clinic in the lawsuit. Any continued litigation in the trial court could have unacceptably resulted in equitable, declaratory, or monetary relief inconsistent with or

---

[9] We note that the statute of limitations on bringing a cause of action specifically under Part 213 is found in MCL 324.21323*l*, which provides, in pertinent part:

> The limitation period for filing actions under this part is as follows:
>
> (a) For the recovery of corrective action costs and natural resources damages . . ., within 6 years of initiation of physical on-site construction activities for the corrective action at the property by the person seeking recovery, except as provided in subdivision (b).
>
> (b) For 1 or more subsequent actions for recovery of corrective action costs . . ., at any time during the corrective action, if commenced not later than 3 years after the date of completion of all corrective action at the property.

[10] Although we question the trial court's conclusion that the clinic's motion for partial summary disposition under MCR 2.116(C)(10) and the market's motion for summary disposition under MCR 2.116(C)(8) were rendered moot with the primary jurisdiction ruling, considering that such motions can result in a definitive "with prejudice" ruling on an element or pleading, which is not the case with primary jurisdiction, the parties do not challenge the mootness determination.

adverse to steps taken and decisions made by the MDEQ in exercising its administrative authority in connection with the petroleum release and contamination.

Affirmed.  No costs awarded under MCR 7.219.

/s/ David H. Sawyer
/s/ William B. Murphy
/s/ Amy Ronayne Krause